# United States Court of Appeals
## For the First Circuit

No. 01-2636

UNITED STATES OF AMERICA,

Appellee,

v.

LUÍS RIVERA NEWTON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan Pérez Giménez, U.S. District Judge]

Before

Lynch, Circuit Judge,
Cyr, Senior Circuit Judge,
and Lipez, Circuit Judge.

Linda Backiel, on brief for appellant.
Aixa Maldonado-Quiñones, Assistant United States Attorney,
with whom H.S. Garcia, United States Attorney, and Sonia Torres-
Pabón, Assistant United States Attorney, were on brief for the
United States.

April 9, 2003

**LIPEZ**, **Circuit Judge**. On April 23, 2001, a jury convicted Luis Rivera Newton ("Rivera Newton", a.k.a. "Luis el Mono," "Luisito") of conspiracy to possess with intent to distribute in excess of five kilograms of cocaine, more than one kilogram of heroin, and multiple kilograms of marijuana. On October 12, 2001, the district court sentenced Rivera Newton to life imprisonment. Rivera Newton now appeals his conviction on three grounds: 1) the district court improperly admitted statements of co-conspirators, 2) the district court erroneously excluded evidence of his prior acquittal in state court for a multiple homicide that formed an integral component of the government's conspiracy case, and 3) his attorneys labored under an impermissible conflict of interest. He also challenges his sentence, claiming that the district court erroneously calculated his offense level under the United States Sentencing Guidelines (the "Guidelines"). Finding no merit in Rivera Newton's contentions, we affirm the defendant's conviction and decline to set aside his sentence.

**I.**

We describe the facts in the light most favorable to the verdict. United States v. Diaz, 300 F.3d 66, 69 (1st Cir. 2002).[1] The evidence at trial described Rivera Newton's involvement in a

[1]We recount facts here to convey a general picture of the case, and provide additional detail in subsequent sections where it is relevant to the legal analysis.

-2-

"hub-and-spoke conspiracy"[2] to distribute multi-kilogram quantities of cocaine, heroin, and marijuana from the early months of 1989 to April 8, 1998. The drugs were sold at specialized distribution points for each substance ("drug points") primarily located within the Gautier Benitez Housing Project ("Gautier Benitez") in Cagua, Puerto Rico. While the drug points were managed by different individuals, every distribution point in Gautier Benitez was ultimately controlled by Edsel Torres Gomez (a.k.a. "Negri"), the de facto "hub" of the conspiracy. At trial, the government portrayed Rivera Newton as Negri's right-hand man and presented witnesses who testified to Rivera Newton's role as a conduit between Negri and lower-level members of the conspiracy. Negri also entrusted Rivera Newton with various high-level responsibilities such as counting the money received in drug transactions and testing the quality of the drugs purchased from other dealers.

Rivera Newton's claims of error implicate, inter alia, the testimony of co-conspirators who served as "spokes" of the conspiracy. Several of these individuals were among the seven co-defendants indicted with Rivera Newton on June 2, 1999. Of these

[2]In a "hub-and-spoke conspiracy," a central mastermind, or "hub," controls numerous "spokes," or secondary co-conspirators. These co-conspirators participate in independent transactions with the individual or group of individuals at the "hub" that collectively further a single, illegal enterprise. See Kotteakos v. United States, 328 U.S. 750, 754-55 (1946).

seven, six pled guilty in exchange for reduced sentences and agreed to testify against Rivera Newton at trial. The seventh co-defendant, Francisco Fernandez Rios ("Fernandez Rios") also testified against Rivera Newton in exchange for a reduction in his sentence for a previous conviction. Their varying roles in the conspiracy and the substance of the testimony at issue in this appeal are best understood in the context of the two major activities undertaken by the conspiracy -- trafficking drugs and protecting Negri's drug empire.

**A.        Drug Trafficking**

The government's first witness was Javier Perez Alicea ("Perez Alicea"), a drug supplier who testified that from 1993 to 1995 he sold approximately 200 kilograms of cocaine to a close confidant of Negri named Jimmy Peligro. Perez Alicea conveyed these drugs to Peligro through approximately 20 to 25 transactions, and Peligro in turn arranged for the cocaine to be sold at the appropriate drug points in Gautier Benitez. Perez Alicea further testified that Rivera Newton participated in three or four of these transactions, helping Peligro and Perez Alicea to count the money being exchanged and testing the quality of the cocaine.

Fernandez Rios, the government's next witness, was the main supplier of drugs to Negri's organization. Beginning in 1992, he sold between 1,500 and 1,600 kilograms of cocaine and approximately 1,000 pounds of marijuana to Negri directly and to an

-4-

associate of Negri named Yuco. Most of these drugs were distributed to drug points managed by Rivera Newton in Gautier Benitez, although Negri also wholesaled some of the drugs to drug points controlled by other traffickers.

The third drug supplier to testify for the government was Cesar Escobar Vazquez ("Cesar Escobar"). Cesar Escobar supplied a total of two kilograms of heroin to Negri's organization for resale in Gautier Benitez,[3] and from June to July 1994 he also sold 2 to 3 kilograms of heroin to a drug dealer named "Davey." Davey rented a drug point from Negri in Barriada Morales and was one of the two victims in the "Isla Verde murders" discussed below.

**B.        Protecting Negri's Drug Empire**

During the period covered by the indictment, various members of the conspiracy took steps to eliminate threats to Negri's drug empire. Of particular relevance to this case are two multiple murders that were committed in furtherance of the conspiracy. The first murders, referred to at trial as the "Isla Verde murders," eliminated Davey and another drug dealer in retaliation for their unauthorized encroachment on Negri's drug points. Perez Alicea testified that he was supplying drugs in October 1994 to an individual named Wes Solano who, according to

---

[3]While Negri primarily operated out of Gautier Benitez, various drug suppliers testified that Negri also controlled a limited number of drug points in two other housing projects -- Villa Del Ray and Barriada Morales.

appellant, was "the head of one of Puerto Rico's most extensive and violent drug organizations." Solano frequented an apartment that Perez Alicea rented in the Isla Verde area. At one point he arranged for Negri, Jimmy Peligro, and Cano Newton (Rivera Newton's brother) to conduct surveillance from the apartment to determine whether Davey and the second drug dealer were infringing on Negri's drug points. After confirming his suspicions, Solano and an accomplice killed the two drug dealers the next day. Later, Solano justified the killings to Perez Alicea as the elimination of two individuals who "were trying to outsmart Negri with regard to . . . certain drug points."

The second multiple murder, dubbed the "Cayey Massacre" by the Puerto Rico press, was the brutal torture and murder of four individuals who supposedly stole $4.2 million in drug proceeds that Negri had temporarily stored at Fernandez Rios's residence. Fernandez Rios testified that avenging this theft was particularly important for Negri not only to recover the money itself, but also because "the loss of that money had to be justified in the eyes of the Colombians" who supplied drugs to Negri and were presumably concerned with the security of his operation.

On March 13, 1994, Negri informed Perez Alicea that he had kidnaped the four individuals who committed the robbery. One of the individuals was shot and killed immediately, and Rivera Newton helped direct the interrogation of the other three. Negri's

associates tortured the three individuals by tearing out their fingernails, burning them with acid, and forcing them to drink gasoline. They then threw the accused thieves in the back seat of a car, where they were shot and set on fire. Rivera Newton's participation in the Cayey Massacre was a central issue at trial, and ultimately an aggravating factor that led the district court to sentence him to life imprisonment, the maximum sentence permitted by the Guidelines.

**II.**

**A.        Hearsay Statements Admitted Under Rule 801(d)(2)(E)**

Rivera Newton claims that the district court erroneously admitted two groups of hearsay statements under Rule 801(d)(2)(E) of the Federal Rules of Evidence: 1) statements made by Solano to Perez Alicea describing the Isla Verde murders, and 2) statements made by Prieto Capota, described at trial as "Negri's triggerman," to Cesar Escobar concerning the Cayey Massacre and Isla Verde murders.

Federal Rule of Evidence 801(d)(2)(E) excludes from the category of hearsay "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). As a predicate for admitting evidence under this rule, the trial court must conclude that "it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the

statement was in furtherance of the conspiracy." United States v.
Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977). In our circuit,
this determination is referred to as a Petrozziello ruling.
Significantly, the trial court is not required to decide the
Petrozziello question prior to admitting hearsay statements under
Rule 801(d)(2)(E), but may "admit the statement[s] provisionally,
subject to its final Petrozziello determination at the close of all
the evidence." United States v. Isabel, 945 F.2d 1193, 1199 n.10
(1st Cir. 1991). Hence, to properly preserve an objection to a
Petrozziello ruling, a defendant must ordinarily object both when
the hearsay statements are provisionally admitted and again at the
close of all the evidence.

Generally, "we review the trial court's determination
that statements were coconspirator statements under the clear error
standard." United States v. Marino, 277 F.3d 11, 25 (1st Cir.
2002) (citing United States v. Mojica-Baez, 229 F.3d 292, 304 (1st
Cir. 2000)). This deferential standard of review places a heavy
burden on a defendant seeking to overturn a trial court's
Petrozziello ruling:

> A finding is clearly erroneous when although
> there is evidence to support it, the reviewing
> court on the entire evidence is left with the
> definite and firm conviction that a mistake
> has been committed. Where the evidence is
> susceptible of two plausible interpretations,
> the trier of fact's choice between them cannot
> be clearly erroneous.

-8-

<u>Reich</u> v. <u>Newspapers of New England, Inc.</u>, 44 F.3d 1060, 1080 (1st Cir. 1995) (internal quotation marks and citations omitted).[4] Applying this standard, we consider the two hearsay statements challenged by Rivera Newton.

1. Statements made by Solano to Perez Alicea describing the Isla Verde murders

Perez Alicea, one of Negri's drug suppliers, testified over the defendant's objections to a conversation he had with Solano about the Isla Verde murders. According to Perez Alicea, Solano told him that the Isla Verde victims were murdered because "they were trying to get away with certain things at some of the drug points that belonged to Negri." Rivera Newton claims that the court's decision to admit this statement was clear error for two reasons: 1) the court had no basis for concluding that Solano (the declarant) and Rivera Newton were co-conspirators, and 2) assuming arguendo that Solano and Rivera Newton were co-conspirators, the hearsay statements could not logically have been made "in furtherance of the conspiracy," <u>Petrozziello</u>, 548 F.2d at 23,

_____

[4]The parties dispute whether our review should be governed by the even more deferential plain error standard, in light of Rivera Newton's conceded failure to renew his objection to the court's <u>Petrozziello</u> determination at the close of all the evidence. Rivera Newton argues that his persistent, standing objections to the court's admission of hearsay testimony throughout the trial cured any defect arising from his failure to object yet again after all of the evidence was submitted. Because we conclude that the trial court did not commit clear error in admitting the hearsay at issue, we do not reach the question of whether the trial court's <u>Petrozziello</u> ruling should only be subject to review for plain error.

-9-

because they were made after the commission of the Isla Verde murders.

We turn first to the question of whether the district court clearly erred in determining that Solano and Rivera Newton were co-conspirators. The defendant points us to United States v. Sepulveda, 15 F.3d 1161 (1st Cir. 1993), in which we held that "a coconspirator's statement, standing alone, is insufficient to meet the preponderance standard of Rule 801(d)(2)(E) . . . [A]dmitting the statement into evidence requires some extrinsic proof of the declarant's involvement in the conspiracy." Id. at 1181. Rivera Newton argues that the government was therefore "required to show, by some independent evidence, that [he] was related to the conspiracy to kill two people in Isla Verde, and the existence of a conspiracy between [him] and . . . Wes Solano."

This argument construes the relevant conspiracy too narrowly. We observed in United States v. Martinez-Medina, 279 F.3d 105 (1st Cir. 2002), that

> each coconspirator need not know of or have contact with all other members, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it. The [finder of fact] may infer an agreement circumstantially by evidence of, inter alia, a common purpose (such as a purpose to sell illicit drugs), overlap of participants, and interdependence of various elements in the overall plan.

Id. at 113-14; see also Marino, 277 F.3d at 25 ("As long as it is shown that a party, having joined a conspiracy, is aware of the

-10-

conspiracy's features and general aims, statements pertaining to the details of plans to further the conspiracy can be admitted against the party even if the party does not have specific knowledge of the acts spoken of.") (internal citations omitted). Here, the jury convicted Rivera Newton for broadly conspiring "to knowingly and intentionally possess with the intent to distribute" large quantities of illicit drugs.  The indictment specified that

> the object of this conspiracy was so (sic) that the defendants and their co-conspirators would earn money illicitly in and through drug trafficking and other drug related activities. The manner and the means by which the unlawful conspiracy was accomplished included the following . . . . [The conspirators] would [] contract killers that would be hired . . . to intimidate and kill rival gang members and to maintain and stabilize control of the organization's drug distribution points.

The evidence at trial highlighted the importance of the Isla Verde murders in furthering the objectives of this larger conspiracy to earn money for Negri's drug organization through the illicit traffic of narcotics -- a conspiracy to which Rivera Newton was undoubtedly a party, viewing the evidence in the light most favorable to the verdict.  See Diaz, 300 F.3d at 69.  Accordingly, the validity of the district court's Petrozziello ruling does not turn on the narrow question of whether Rivera Newton conspired in the commission of the Isla Verde murders.  To uphold the district court's Petrozziello ruling under a clear error standard we need only confirm that the evidence at trial permitted the trial judge

to conclude that Solano and Rivera Newton were co-conspirators in the broader drug trafficking conspiracy.

Even setting the disputed statements to one side, see Sepulveda, 15 F.3d at 1181, Perez Alicea's testimony could reasonably have led the district court to conclude that Solano participated in the drug trafficking conspiracy by helping to eliminate individuals who encroached on Negri's drug points. Perez Alicea testified at length to an encounter with Negri and several other individuals in October 1994. Negri had obtained the keys to an apartment in Isla Verde that Perez Alicea rented and shared with Solano, and Negri's associates asked Perez Alicea for the location of "the apartment that Wes [Solano] had." After Perez Alicea led them to the apartment, Jimmy Peligro, one of Negri's associates, made phone calls in an effort to locate Solano. The other members of Negri's party began surveillance of the apartment next door to Perez Alicea, discussing at one point how the individuals within the apartment were "really going to be fucked" once Solano showed up. Perez Alicea further testified that the next day, Negri's associates confirmed that they had made contact with Solano; within the next three to five days Solano revealed to Perez Alicea in the conversation at issue that he had committed the Isla Verde murders. Perez Alicea's uncontradicted testimony describing the period immediately preceding the Isla Verde murders supports the interpretation that Solano participated in the broad conspiracy

-12-

outlined in the indictment. Accordingly, the trial court did not clearly err in determining that Rivera Newton and Solano were co-conspirators within the meaning of Rule 801(d)(2)(E).

Rivera Newton's alternative argument that Solano's comments about the Isla Verde murders did not "further the objectives of the conspiracy" is similarly unavailing. The defendant argues that an after-the-fact description of the Isla Verde murders could not have furthered the objective of eliminating individuals who by that time were already dead. Once again, this argument construes the relevant "objective" of the conspiracy too narrowly. The Petrozziello requirements are satisfied so long as Solano's act of communicating the motivation behind the murders and the manner in which they were committed furthered the broad objectives of the drug trafficking conspiracy. In this instance, Solano, who the appellants concede "acted, at times, as a hired gun for Negri," was informing a major drug supplier to Negri's organization that he had committed a multiple murder to protect Negri's drug points from unauthorized use. The trial court could reasonably have determined that this conversation served the important function of reassuring Perez Alicea that Negri's drug organization was effectively addressing external threats to its security and profitability. See United States v. Ammar, 714 F.2d 238, 252 (3d Cir. 1983) ("Statements between the conspirators which provide reassurance, serve to maintain trust and cohesiveness among

them, or inform each other of the current status of the conspiracy further the ends of the conspiracy and are admissible so long as the other requirements of Rule 801(d)(2)(E) are met.").[5]

     2.     Statements made by Prieto Capota to Cesar Escobar concerning the Cayey Massacre and Isla Verde murders

Approximately one month after the Cayey Massacre, Prieto Capota recounted in detail the torture and murder of the four Cayey victims during a conversation with Cesar Escobar, another of Negri's drug suppliers. At trial, Cesar Escobar repeated Prieto Capota's description of the Cayey Massacre to the jury. Although the defendant concedes that he and Prieto Capota (the declarant) were co-conspirators within the meaning of Rule 801(d)(2)(E), he argues that the statements are nonetheless inadmissible for two reasons: 1) the statements did not further the objectives of the conspiracy as required by Petrozziello, and 2) the statements were unduly prejudicial and should have been excluded under Rule 403. Once again, in light of Rivera Newton's failure to raise the Rule

_____

[5]Rivera Newton also claims, belatedly, that the trial court should have excluded this portion of Perez Alicea's testimony on grounds that its probative value was outweighed by its prejudicial effect. Fed. R. Evid. 403. Because Rivera Newton never raised this objection below, we review for plain error only. United States v. Balsam, 203 F.3d 72, 85-86 (1st Cir. 2000). Applying this highly deferential standard, we do not find that the trial court's decision to admit this testimony under Rule 403 was an error "so shocking [as to] seriously affect the fundamental fairness and basic integrity of the proceedings conducted below." United States v. Griffin, 818 F.2d 97, 100 (1st Cir. 1987).

-14-

403 objection below, we review the trial court's decision to admit Cesar Escobar's testimony under Rule 403 for plain error, and apply a clear error standard to the trial court's Petrozziello determination. These claims of error are indistinguishable from Rivera Newton's Petrozziello and Rule 403 arguments challenging the admission of Perez Alicea's testimony, and we reject them for the reasons outlined above.[6]

**B.**    **The Exclusion of Rivera Newton's Acquittal on State Murder Charges Stemming from the Cayey Massacre**

Prior to trial, the government filed a motion in limine to prohibit Rivera Newton from alluding to his previous acquittal in state court on murder charges stemming from the Cayey Massacre. The district court granted the motion, relying, inter alia, on our prior decisions specifying that "a district court has discretion to exclude from evidence acquittals or other favorable outcomes of prior state court proceedings involving the same subject matter." United States v. Marrero-Ortiz, 160 F.3d 768, 775 (1st Cir. 1998);

---

[6]Rivera Newton cursorily raises Petrozziello and Rule 403 claims challenging the trial court's admission of other testimony from Cesar Escobar regarding 1) an argument between Negri and Davey, one of the Isla Verde victims, and 2) Cesar Escobar's conversations with an ex-partner and a car dealer in which he was told that Davey had been killed at Isla Verde. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Even if Rivera Newton had not abandoned these arguments on appeal, we would have no cause to reverse the district court's decision to admit this testimony under the plain error standard of review occasioned by appellant's failure to raise contemporaneous objections to these statements below.

see also United States v. Smith, 145 F.3d 458, 462 (1st Cir. 1998).

Citing Federal Rule of Evidence 403, the judge also concluded that "the probative value of the acquittals is substantially outweighed by the danger of unfair prejudice."

Although Rivera Newton does not challenge the district court's authority to grant the motion in limine, he argues that the prosecution took unfair advantage of the trial court's ruling by repeatedly referring to the fact that he had been charged with the Cayey murders, knowing that he could not dispel the prejudice arising from those references by introducing the fact of his acquittal. As a threshold matter, both parties misrepresent the extent to which the government referred to Rivera Newton's state murder charges. The defendant alleges that the prosecution "allowed the fact of the prior trial to permeate its evidence,"[7] while the government retorts that "[a]t no time during trial were appellant's charge, arrest or acquittal mentioned." In fact, our

---

[7]This misstatement perhaps reflects the appellant's efforts to conflate testimony concerning the Cayey Massacre itself with testimony referring to the state murder charges brought against Rivera Newton in the aftermath of the incident. The government matter-of-factly concedes in its brief that the former was a major element of their case, asserting that "the Cayey Massacre proved to be this violent organization's way to recuperate millions of dollars in drug proceeds stolen from them, and a way to demand respect from non-members." We agree with the government that the introduction of evidence pertaining to Rivera Newton's acquitted conduct did not preclude the judge from excluding the fact of Rivera Newton's acquittal. United States v. Candelaria-Silva, 166 F.3d 19, 35 (1st Cir. 1999); Smith, 145 F.3d at 462 (1st Cir. 1998).

review of the record reveals a single instance in which the government elicited a reference to Rivera Newton's state murder trial. During the prosecution's direct examination of Antonio Garay Fonseca, a longtime acquaintance of Rivera Newton, the following exchange occurred:

> Q: I ask you, sir, have you ever heard about what is known as the Cayey massacre?
>
> A: Yes.
>
> Q: How is it that you, yourself find out? Where were you when you found out?
>
> A: I was in jail here in the prison in Guaynabo.
>
> Q: And I ask you, sir, now, have you ever discussed the event of the Cayey massacre with Luis El Mono [Rivera Newton]?
>
> A: Yes, on several occasions.
>
> Q: Can you please tell us what was the contents of that conversation?
>
> A: Well, <u>I asked him how his case, the case involving the massacre was coming along</u>.

Rivera Newton argues that the court erred by failing sua sponte to alleviate the prejudice from this exchange in one of two ways: 1) the court could have rescinded its ruling in limine and permitted Rivera Newton to "present the other half of the story" by introducing the fact of his acquittal, or 2) the court could have expressly instructed the jury not to consider the state murder charges as evidence of Rivera Newton's guilt on the federal indictment. Because Rivera Newton did not ask the trial court to

-17-

rescind its earlier ruling excluding evidence of his acquittal or give the aforementioned jury instruction, we review the errors alleged for plain error. Garay Fonseca's reference to Rivera Newton's state prosecution for murder, occurring within the context of a nine-day trial that generated over nine hundred pages of trial testimony, did not require the court to reverse its earlier decision to exclude evidence of Rivera Newton's acquittal or provide a curative jury instruction. The former remedy presented an unwarranted risk of confusing the jury, while the latter would likely have attracted more attention to the state murder charges than Garay Fonseca's remark. In any event, this reference was not "so shocking that [it] seriously affect[ed] the fundamental fairness and basic integrity of the proceedings conducted below." Griffin, 818 F.2d at 100.

Rivera Newton also draws our attention to a second reference to his state murder charges elicited by his own lawyers over the government's objection. Jose Quiñonez Robles, the FBI agent assigned to Rivera Newton's case, was asked by defense counsel during cross-examination whether he was aware that Rivera Newton had no criminal record. After the court overruled the government's objection to the question, Quiñonez responded: "Yes, I know that he was accused in the local system for participating in the Cayey massacre." Pressed further, Quiñonez clarified that Rivera Newton had only been accused of murder at the state level,

-18-

and that to his knowledge the defendant did not have a criminal record.

Quiñonez's evasive response to defense counsel's question regarding Rivera Newton's criminal record is disturbing. As an experienced FBI agent, he presumably understood the difference between a criminal record and a criminal charge, and his answer was clearly not responsive to defense counsel's inquiry. Nonetheless, the defense did not move to strike Quiñonez's testimony. Arguably, his reference to the state charges even benefitted the defense. There had already been a reference to the state case in the earlier testimony of Garay Fonseca. Quiñonez's subsequent mention of the state accusations permitted Rivera Newton's counsel to extract the concession that, to the witness's knowledge, Rivera Newton had no criminal record, thereby prompting a possible inference by the jury that Rivera Newton was acquitted of the state charges. Regardless, we find no error, let alone plain error, in the trial court's failure to instruct the jury sua sponte to disregard the statement.

## C.      Conflict of Interest

Three days before the beginning of Rivera Newton's trial, the government alerted the district court to information obtained from Fernandez Rios, a government witness, regarding arrangements by Negri's drug organization to finance the legal defense of Rivera Newton and other criminal defendants associated with the organization in prior state proceedings. Specifically, Fernandez

-19-

Rios revealed during an interview that after several members of Negri's drug organization were indicted in March 1995 on state murder charges stemming from the Cayey Massacre, he informed a Colombian drug source named "Mauricio" that the Cayey defendants needed financial assistance for their legal defense. Mauricio agreed to send Fernandez Rios forty kilograms of cocaine to pay for their legal expenses, and Fernandez Rios subsequently arranged to sell the cocaine in the United States for approximately $20,000 per kilogram. The proceeds from this drug shipment were turned over to Ramon Delgado ("Bronco"), an attorney who was closely associated with Negri. While Fernandez Rios could not identify the attorneys who received money from Bronco, he had reason to believe that Edgar Vega-Pabón, one of Rivera Newton's attorneys in the state proceedings, and now one of his attorneys in this federal case, may have been paid from this drug fund for defending an individual named Ismael Vega in another case. However, the government had no direct evidence that Bronco paid Vega-Pabón to defend Rivera Newton, or that José Andreu, Rivera Newton's other trial attorney in this case, ever received money from Bronco. In fact, during the colloquy between the court and attorneys from both sides that followed the government's presentation of these facts, Vega-Pabón denied that he had ever knowingly received funds from Bronco.

According to Rivera Newton, the fact that his attorneys may have been compensated through Bronco's legal defense fund

created a possible conflict of interest for the following reason: if Vega-Pabón and Andreu feared that Fernandez Rios would expose them as beneficiaries of Bronco's legal defense fund, they may have tempered their cross-examination of a crucial witness for the government.[8] Alerted to the possibility of a conflict, the district court questioned Rivera Newton to ensure 1) that he was aware of the potential conflict of interest, 2) that his attorneys had explained the relevant circumstances to him, and 3) that he nonetheless wished to retain Andreu and Vega-Pabón as defense counsel. After hearing the court recite the information conveyed earlier by the government, Rivera Newton confirmed that his attorneys had previously discussed the matter with him, and assured the court that he wanted them to continue as counsel. Rivera Newton now claims on appeal, however, that the court's failure to more fully explain how this conflict of interest could manifest itself at trial constitutes reversible error under the Sixth Amendment: "[F]aced with these troubling assertions, [the court] had a duty to describe or illustrate why Appellant might prefer to have counsel not likely to be distracted by the threat that

---

[8]Rivera Newton articulates the gravity of the conflict more colorfully in his Reply Brief, arguing that "Andreu was virtually precluded from cross-examining Fernandez, lest Fernandez accuse him of knowing receipt of drug proceeds (at a minimum) from the witness stand. Indeed, Andreu's mere presence at counsel table was a liability for Appellant because the jury might well infer that his role was to represent the interests of the conspiracy."

[Fernandez Rios] would persist in his allegations [that counsel had been compensated by Bronco]."

The defendant's claim of error is styled somewhat oddly. He expressly disclaims any argument that the trial court's failure to adequately explain the potential conflict of interest induced him to retain counsel who rendered ineffective assistance, specifying that "[r]ather than an ineffective assistance claim, Appellant has raised only the narrow issue of the legal sufficiency of the District Court's colloquy to determine whether Appellant was aware of a potential conflict of interest with his attorney and wished to waive it" (emphasis added). Put another way, Rivera Newton argues that the trial court's failure to describe adequately the conflict of interest constitutes reversible error requiring a new trial, irrespective of the quality of defense counsels' performance: "[I]t is the failure to explain the nature of the conflict that would allow Appellant to make an intelligent waiver, not any specific trial error, that requires this court's remedial attention."

The circumstances of this case provide no basis for overturning a conviction on Sixth Amendment grounds absent any allegation by the defendant that the performance of defense counsel suffered as a result of the alleged conflict. In Mickens v. Taylor, 535 U.S. __, 122 S.Ct. 1237 (2002), the Supreme Court expressly rejected a rule of automatic reversal in cases where a

defense attorney's conflict of interest does not adversely affect counsel's performance, observing that such a rule "makes little policy sense." Id. at 1244. The Court elaborated that a trial court's failure to adequately investigate a potential conflict of interest

> neither renders it more likely that counsel's performance was significantly affected nor in any other way renders the verdict unreliable. Nor does the trial judge's failure to make the Sullivan-mandated inquiry[9] [] make it harder for reviewing courts to determine conflict and effect, particularly since those courts may rely on evidence and testimony whose importance only becomes established at the trial.

Id. Because adverse performance is the touchstone of Sixth Amendment error under the Supreme Court's actual conflict-of-interest jurisprudence, Mickens, 122 S.Ct. at 1244 n.5, Rivera Newton's argument for per se reversal on grounds that the judge inadequately explained the nature of the particular conflict is at odds with controlling Supreme Court precedent.[10]

---

[9]In Cuyler v. Sullivan, 446 U.S. 335 (1980), the Supreme Court promulgated a rule requiring trial courts to conduct an inquiry if they "know or reasonably should know" that defense counsel is laboring under a conflict of interest. Id. at 347.

[10]Our decision in United States v. Foster, 469 F.2d 1 (1st Cir. 1972), relied upon heavily by Rivera Newton, does not permit automatic reversal here. In Foster, we exercised our supervisory powers to require district courts to explain to defendants in detail the risks of proceeding to trial "where one attorney speaks for two or more defendants." Id. at 4-5. However, this rule, now codified as Federal Rule of Criminal Procedure 44(c), is expressly limited to cases of joint or multiple representation, id. at 4, a circumstance that does not exist on the facts before us.

**D.      The District Court's Calculation of Rivera Newton's Offense Level**

Applying sections 2D1.1 and 2A1.1 of the United States Sentencing Guidelines, the district court sentenced Rivera Newton to life imprisonment, the maximum sentence permitted under the Guidelines. The court predicated its sentence on two alternative Guidelines calculations, either one of which, standing alone, mandated the imposition of a life sentence. First, applying the "murder cross reference" provision of U.S.S.G. § 2D1.1(d)(1), the court determined by a preponderance of the evidence that Rivera Newton's role in the Cayey Massacre warranted a base offense level of 43. After adding a three-level enhancement for Rivera Newton's leadership role in the conspiracy and a two-level enhancement for possession of a weapon during the course of the offense, the court calculated a total offense level of 48.[11] Alternatively, the court attributed to Rivera Newton responsibility for distributing in excess of 150 kilograms of cocaine, resulting in a base offense level of 38. U.S.S.G. § 2D1.1(c)(1). The court increased Rivera

---

Furthermore, under <u>Foster</u>, violations of this rule do not trigger automatic reversal, but merely shift the burden of persuasion to the government "to demonstrate from the record that prejudice to the defendant was improbable." <u>Id.</u> at 5. Here, the government would easily satisfy this burden in the absence of any allegation by Rivera Newton that he was prejudiced by defense counsel's performance at trial.

[11]As the district court noted, "the guidelines do not go above 43." Accordingly, any offense level of 43 or above is punishable by a life sentence.

Newton's offense level under this second calculation to 43 after adding five points for leadership and possession of a weapon. Hence, Rivera Newton was subject to life imprisonment under either sentencing calculation.

On appeal, Rivera Newton challenges both Guidelines calculations on three grounds: 1) the court violated his due process rights by applying U.S.S.G. § 2A1.1 after finding by a preponderance of the evidence that he had participated in the Cayey Massacre, 2) the court unreasonably attributed to Rivera Newton responsibility for the entire quantity of drugs handled by Negri's organization, and 3) the court erroneously concluded that Rivera Newton was a leader in the drug conspiracy. We find no reversible error in the district court's application of the murder cross-reference provision of section 2D1.1(d)(1), which alone results in a base offense level of 43. Accordingly, we do not reach appellant's claims implicating the district court's drug calculation and three-level leadership enhancement.

1. Legal analysis

Section 2D1.1 is the provision of the Guidelines that governs the sentencing of defendants like Rivera Newton convicted of "Unlawful Manufacturing, Importing, Exporting or Trafficking; Attempt or Conspiracy." Subsection (d) of this provision, entitled "Cross References," provides the following: "If a victim was killed under circumstances that would constitute murder under 18 U.S.C.

§ 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder)." Section 2A1.1 of the Guidelines, in turn, directs the court to assign a base offense level of 43 to any defendant whose conduct falls within the provision. The district court invoked § 2A1.1 in calculating defendant's sentence, determining that "although he did not participate directly in the actual killing [of the Cayey Massacre victims], certainly he was part of the planning, he was there . . . . He participated in the torturing after these three individuals had been kidnaped at a distance from Gautier Benitez."

We review the district court's application of a particular sentencing guideline de novo. United States v. Padro Burgos, 239 F.3d 72, 76 (1st Cir. 2001). Appellant argues that there is an element of unfairness in the district court's decision to impose a sentence at the upper end of the guideline range for conduct that Rivera Newton was previously acquitted of in state court. Nonetheless, as Rivera Newton concedes, the law as it currently stands affords us no basis for overturning his sentence on due process grounds. As we observed in United States v. Lombard, 72 F.3d 170 (1st Cir. 1995): "A sentencing court may . . . consider relevant conduct of the defendant for purposes of making Guidelines determinations, even if he has not been charged with -- and indeed, even if he has been acquitted of -- that conduct, so

-26-

long as the conduct can be proved by a preponderance of the evidence." Id. at 176 (original emphasis).

Our post-Apprendi jurisprudence provides no succor to the defendant. In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court ruled that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490 (emphasis added). Our decisions following Apprendi emphasize that district court judges have broad latitude to make factual findings that vary a defendant's sentence within the prescribed statutory range. Indeed, in United States v. Martinez-Medina, 279 F.3d 105 (1st Cir. 2002), we rejected an Apprendi argument nearly identical to Rivera Newton's challenge in this case. The defendants in Martinez-Medina similarly attempted to overturn life sentences on grounds that "the sentencing court violated Apprendi by finding, under a preponderance of the evidence standard, that they played a role in various conspiracy murders, thus subjecting them to life imprisonment." Id. at 122. There we noted that "[t]he argument fails . . . because Apprendi does not apply to findings made for purposes of the sentencing guidelines, such as the court's determination that the appellants were accountable for the murders." Id.

However, Rivera Newton now requests that we expand Apprendi to require juries to find beyond a reasonable doubt that

-27-

the defendant committed murder before the sentencing court is permitted to apply the "cross-reference" provision of section 2D1.1(d)(1).  We decline this invitation to expand Apprendi, as we have on prior occasions:

> We . . . decline the appellant's invitation to expand the Apprendi rule . . . .  Giving [Apprendi its] plain meaning, sentence-enhancing facts still may be found by the judge under a preponderance-of-the-evidence standard as long as those facts do not result in a sentence that exceeds the original statutory maximum.  Indeed, the Apprendi Court itself commented that nothing in the history of criminal jurisprudence suggests that it is impermissible for judges to exercise discretion in imposing a judgment within the range prescribed by statute.

United States v. Robinson, 241 F.3d 115, 121 (1st Cir. 2001) (internal quotation marks omitted) (original emphasis).

2.  Factual findings

Rivera Newton further contends that the district court's application of U.S.S.G. § 2D1.1(d)(1) was not supported by a preponderance of the evidence.  We review the factual findings underlying the district court's application of a particular sentencing guideline for clear error.  Padra Burgos, 239 F.3d at 76.  The court heard eyewitness testimony from William Del Valle-Caraballo, a resident of the Gautier Benitez housing project, who observed Rivera Newton holding a .38 caliber nickel-plated pistol the night before the Cayey Massacre during a meeting with Negri and other members of the drug trafficking organization.  The next day,

-28-

Del Valle observed three individuals with bloodstained clothing as they were pulled out of a car and taken behind a neighboring building. Del Valle further testified that after the three individuals were brought back to the car, Rivera Newton raised and lowered a red gasoline can with a white spout as if he were spraying gasoline inside the vehicle.

Much of Del Valle's testimony was corroborated by Cesar Escobar, who testified that he was told by Prieto Capota that the Cayey victims were thrown into the back seat of a car, forced to drink gasoline, and then executed and set on fire. Finally, Garay Fonseca, Negri's long-time acquaintance, testified that Rivera Newton admitted to committing the murders:

> Q:    Sir, I ask you, did there ever come a time when the defendant, Luis El Mono, admitted to you what was his participation in the massacre of Cayey?
>
> A:    Yes.
>
> Q:    And what did he admit to you?
>
> A:    Well, his words, he said that he killed them.

In the face of this evidence, we find no clear error in the district court's decision to invoke section 2D1.1(d)(1) in assigning the defendant a base offense level of 43.

### III.

Notwithstanding defense counsel's vigorous efforts on Rivera Newton's behalf throughout this appeal, our close review of the record reveals no error that warrants overturning the

-29-

conviction or sentence.  Accordingly, the judgment of the district court is **affirmed**.

<u>So ordered.</u>