# United States Court of Appeals
## For the First Circuit

Nos. 05-1384
    05-2039
    05-2040

UNITED STATES OF AMERICA,

Appellee,

v.

LUIS AVILÉS-COLÓN, JOSE J. GALIANY-CRUZ,
and JUAN CARRIÓN TORRES,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. Garcia-Gregory, U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

David Abraham Silverman for appellant Avilés-Colón.
Jose E. Rivera-Ortíz for appellant Galiany-Cruz.
Linda Backiel for appellant Carrión Torres.
Julia M. Meconiates, Assistant United States Attorney, with
whom Rosa Emilia Rodriguez-Velez, United States Attorney, and
Nelson Pérez-Sosa, Assistant United States Attorney, were on brief,
for appellee.

July 31, 2008

**LIPEZ**, <u>Circuit Judge</u>.  An indictment alleged that seventeen individuals conspired to distribute heroin, cocaine, and marijuana between December 2000 and March 2003 at three drug points in Coamo, Puerto Rico in violation of 21 U.S.C. §§ 841(a) and 846. Most of these individuals were also charged with possession of firearms in furtherance of the conspiracy in violation of 18 U.S.C. §§ 921(a)(3) and 924(c)(1).  All but the three appellants here, Juan Carrión Torres ("Carrión"), José Galiany-Cruz ("Galiany"), and Luis Avilés-Colón ("Avilés"), pled guilty to the charges alleged in the indictment.  The appellants were tried jointly, and a jury found each guilty on the conspiracy and firearms counts.  The appellants were later sentenced to lengthy prison terms.

The appellants each raise a number of challenges to their convictions and sentences.  After careful review of the record and case law, we have found no reversible error with respect to either Galiany or Avilés and therefore affirm their convictions and sentences.  However, we conclude that the government's failure to disclose exculpatory evidence material to Carrión's defense, in violation of <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963), requires us to vacate his convictions and sentence.

**I.**

The evidence presented by the government in the appellants' eight-day jury trial was provided primarily through the testimony of three witnesses –- confidential informant Carlos

Bonilla Santos ("Bonilla"), cooperating co-defendant Carlos Iván Torres-Martinez ("Torres"), and Special Agent Noel Gil ("Gil") of the Federal Bureau of Investigations ("FBI"). The government also introduced audiotapes of conversations among the co-conspirators that Bonilla recorded during his undercover participation in the conspiracy.

We begin by providing a brief general description of the drug-trafficking conspiracy, as depicted by the witnesses' testimony, and then recount in some detail particular evidence provided by Bonilla and Torres. Throughout, the facts are conveyed in the light most favorable to the verdict. United States v. Rodriquez-Marrero, 390 F.3d 1, 6 (1st Cir. 2004).

## A. General Description

Appellants were among seventeen individuals who operated multiple drug points in Coamo, Puerto Rico, between December 2000 and March 2003.[1] Appellant Galiany was the leader of the group, known as the Cataño gang,[2] and appellants Carrión and Avilés were both identified as enforcers who protected the conspiracy's drug business against rival gang members and helped the conspiracy expand to new drug points, including those under the control of

---

[1] Appendix 1 provides a roster of the individuals involved in this case, which includes some of the co-defendants. Appendix 2 provides a timeline of the important events in the charged conspiracy.

[2] Cataño is a nickname used to refer both to Galiany and to the gang that he ran.

-3-

rival gangs. Torres testified that he also worked as a runner, delivering drugs to street-level sellers within the organization and collecting money from those sellers. The conspirators would buy large quantities of drugs, divide those drugs into smaller packages, and then sell the repackaged drugs at their drug points.

Although the government's witnesses described interactions between Carrión and other members of the conspiracy, Carrión contended that he was, in fact, a rival of Galiany's gang and thus not a member of the conspiracy charged in the indictment. He presented no witnesses in his defense, but relied on challenges to the credibility of Bonilla and Torres. Galiany defended himself by trying to impeach Torres's testimony and arguing that Torres led the conspiracy and was testifying against him to deflect responsibility in the hopes of getting a lower sentence. He also presented one witness in his defense. Avilés primarily argued that there was insufficient evidence linking him to the conspiracy and, like Carrión, he declined to offer any witnesses in his defense.

## B. Specific Testimony

### 1. Bonilla

Bonilla, a former police officer, testified that he was "pensioned honorably" from the Puerto Rico police force because of injuries stemming from an incident in which he apprehended a gun-wielding assailant attempting to rob his father's store. After his retirement from the police force, he sold jewelry and operated a

-4-

pawn shop out of his home in Coamo. Through this business, he became familiar with members of the Cataño organization. Bonilla first met Galiany in February 2001 when Galiany came to his home to purchase paint and jewelry. He next saw Galiany when co-defendant Jose Flores-Rivera ("Flores") arranged for Galiany to rent a car from Bonilla. Bonilla encountered Galiany again in March 2001, in a gray Acura with co-defendant Kelvin Torres-Ruiz ("Kelvin") and "Juanito," whom he later identified as appellant Carrión. Kelvin was driving, and "Juanito" was in the back seat holding two AK-47s. Although it was night, Bonilla was able to clearly see the guns because the car stopped near him and he shook hands with the three men in the car. During this encounter, Galiany told Bonilla that they were looking for "Cuquito," who controlled the Las Palmas drug points, so that they could kill him.

Although Bonilla was not yet working as an FBI informant, he reported the encounter to the FBI because he had a "relationship of trust" with FBI Agent Digno Cartagena from his tenure on the police force. Subsequently, Bonilla entered into a formal relationship with the FBI to act as a confidential informant.[3] He agreed to wear a hidden tape recorder during some of his encounters with people who were suspected of being members of Galiany's gang.

---

[3] Bonilla also testified that shortly after he became an informant for the FBI, Galiany asked him to come with him to Carrión's home. Galiany wanted Bonilla to look at Carrión's stereo equipment and tell him whether the equipment was of a good quality. During that visit, Carrión was not at home.

-5-

In the course of his testimony, Bonilla explained that Galiany controlled various Coamo drug points, including ones in La Vega del Puente, San Luis, and Santa Ana, as well as a drug point in Las Ollas, Santa Isabel. In March 2001, Bonilla visited the La Vega del Puente point with Galiany and co-defendants Julio Mateo-Espada ("Mateo") and Flores. When Galiany learned that the conspiracy members at that point had no drugs on hand to sell, Galiany, Mateo, Flores, and Bonilla went to Galiany's house to process drugs. They mixed large blocks of heroin with unidentified chemicals, divided the large blocks into smaller units, and then packaged these smaller units in little pieces of colored paper. Based on his experience as a police officer, Bonilla testified that they were processing an eighth of a kilogram of heroin. At that time, he saw several handguns and revolvers in Galiany's house.

Bonilla returned to Galiany's house on many occasions. Several times he saw Avilés there, but did not engage with him. In December 2001, Galiany took Bonilla to Avilés's house to collect money, which Bonilla presumed was from drug sales, and to show Bonilla a 30-06 Remington model rifle.

Four months later, on March 21, 2002, Galiany came to Bonilla's house and gave him a bag with an Uzi in it, saying "Keep this for me because the police is after me." After Bonilla reported the incident to the FBI, the agents decided to stage an arrest of Bonilla to protect his undercover status while enabling

-6-

them to seize the Uzi. Bonilla was then quickly released from jail. When Galiany came by his house the next day, Galiany said, "Man, if you are giving information to the FBI, don't tell them anything about me. I mean, give me a break because I'm not doing anything wrong and I have children." Bonilla told Galiany that he was not working for the FBI. Galiany then said in reference to the Uzi: "That's Juano's [Carrión's] and now I am responsible for it. I have to respond for it."[4]

While on the stand Bonilla explained that he had been able to record Galiany, Torres, and other gang members on several occasions. These recordings were entered into evidence and Bonilla described the contents of the recordings he made while in the company of Galiany and his men. Several of these recordings, including the ones described below, were played for the jury. Since the recordings were in Spanish, the jury was provided with a Spanish transcript and an English translation of the recordings. In a recording made on February 6, 2002, Galiany discussed the events leading up to his shooting of "Nelson," a rival drug dealer.[5] In a conversation recorded on February 27, 2002, Galiany was trying to borrow money from Bonilla to purchase an AK-47.

---

[4] This particular conversation between Bonilla and Galiany was not recorded on tape nor were any of the aforementioned conversations involving Bonilla.

[5] The shooting of "Nelson" was not included in the indictment as an overt act in furtherance of the conspiracy and the government does not contend that we should view it as such on appeal.

Bonilla was reluctant to lend Galiany the money, but Galiany explained that he would be able to repay Bonilla after he sold the cocaine he had on hand. Galiany also discussed the quality of the cocaine he was processing at the time, urging Bonilla to sample it. In a recording from March 27, 2002, which was played on cross-examination, Torres told Bonilla that "Juanito" (Carrión) and rival gang member "Enrique" wanted to kill "Jose" (Galiany).[6]

2. Torres

Torres, the cooperating co-defendant, testified that he was involved in packing and processing the drugs that were sold at the drug points. Weekly, he processed about an eighth of a kilogram of heroin, an eighth of a kilogram of cocaine, and a half pound of marijuana. In addition, as an enforcer and a runner, he transported drugs to the drug points and collected money from the dealers. According to Torres, Galiany's gang controlled three drug points in Coamo -- La Vega del Puente, San Luis, and Santa Ana. Heroin was sold daily at La Vega del Puente, cocaine and marijuana were sold at San Luis on Thursdays and Fridays, and cocaine was sold those same two days at Santa Ana.

Torres testified that members of the conspiracy would often carry firearms. Carrión had an Uzi pistol, Galiany owned a Smith & Wesson nine millimeter gun and two pistols, and Avilés

_____

[6] Bonilla testified that he understood Torres to be referring to Carrión when he said "Juanito" and Galiany when he said "Jose."

-8-

owned a Remington rifle. The firearms were necessary for protecting and expanding the conspiracy's drug territory, especially since the enterprise was often "at war" with rival drug organizations.

Torres reported that at least three murders were committed in furtherance of the conspiracy. Alexander Rivera Maldonado ("Maldonado"), a member of the rival Las Palmas gang, was shot on March 16, 2001. Torres testified that on that same day he drove with Galiany to pick up Carrión, Avilés, and co-defendant Flores in the La Flores Ward of Coamo. According to Torres, Galiany told him that Carrión and Avilés had shot one of the Las Palmas members while he was in a nearby car. Torres then drove Galiany, Carrión, Avilés, and Flores to a river in Coamo so they could wash off the gunpowder they had on themselves as a result of the shooting. The next day, Galiany directed Torres to bring the appellants back to Las Flores so that they could retrieve the weapons that had been stashed alongside a river near the scene of the shooting. Torres made that trip and then transported the group back to Galiany's house, at which point Torres saw the weapons for the first time. At Galiany's house, the appellants cleaned their weapons while others packed drugs.[7]

---

[7] Carrión and Avilés cleaned a .38-caliber nickel-plated revolver and a .40-caliber pistol. At the scene of the shooting, the police found four .40-caliber spent bullet cases.

The second murder occurred on September 16, 2001. Galiany, Torres, Kelvin, and co-defendant Hector Reyes-Martinez went to a birthday party attended by Las Palmas members with the goal of avenging the recent murder of a member of Galiany's gang. Kelvin shot at two Las Palmas members, killing Alex Torres Franco. Each of the conspirators in Galiany's gang carried a weapon, but the bullets found at the scene matched the type of revolver carried by Kelvin.

The final murder described by Torres was that of rival gang member Yamil Santiago Rodríguez ("Santiago"), which occurred in either October or November 2001. Torres testified that Santiago had been planning to kill Carrión. Wanting to protect Carrión, Galiany called Torres and told him to kill Santiago if they found him. Torres traveled to Santa Isabel with Avilés and co-defendant Mateo in order to find Santiago. The three men were eating at a restaurant in Santa Isabel when they encountered Santiago and invited him to join them on their trip to Salinas. En route, they stopped and got out of the car to urinate on the side of the road. Santiago was standing in front of Torres, and Avilés signaled to Torres that he should kill Santiago. Torres pulled out his revolver and shot Santiago on the left side of his back. Then Torres's revolver jammed, allowing Santiago to run into the woods. Mateo, Avilés, and Torres ran after Santiago with Torres's revolver that Mateo had managed to fix. They found Santiago, who had fallen

to the ground, and Avilés snapped Santiago's neck. Torres said he then went back to the car alone and, while he was waiting for Avilés and Mateo, he heard another shot. Avilés and Mateo returned to the car without Santiago and the three of them then drove back to their respective homes.

### 3. Agent Gil

Gil became involved in the FBI's investigation of Galiany's gang in August 2001. He solicited the cooperation of co-defendant Torres and monitored conversations between confidential informant Bonilla and some of the subjects of his investigations. As the first witness to testify, Gil provided an overview of the evidence to be presented with the aid of a chart depicting the conspiracy's members and their respective roles. Carrión objected to Gil's testimony and his chart, contending that Gil was simply parroting information he had been given by Bonilla and Torres. The government countered that objection by arguing it should be allowed to offer testimony that reflected the conclusions of Gil's investigation. The court overruled Carrión's objections and allowed Gil's overview testimony.[8]

---

[8] Puerto Rico Police Officers Alberto Giraud Vega ("Giraud") and Charles Alvarado Dávila ("Alvarado") also testified. Giraud testified that when he arrived at the scene of the March 16, 2001 murder of Maldonado, he saw a blue Toyota Camry with bullet holes that had four .40-caliber spent bullet casings next to it. When Giraud interviewed a woman who said that she had been in the Camry during the earlier shooting, she provided a physical description of the shooter that was consistent with Carrión's appearance. Giraud also explained that on August 23, 2002, he was directed to the body

4. Defense Witness

At the close of the government's case, the three co-defendants moved pursuant to Federal Rule of Criminal Procedure 29 for a judgment of acquittal.  The court denied each motion.  Galiany then called one witness -- his neighbor, the uncle of Alex Torres Franco, the Las Palmas member who, according to Torres, had been killed at a birthday party in September 2001.  This witness testified that he and Galiany were together for the entire time between 8:00 p.m. and 9:30 p.m. on the day of that shooting.  No additional witnesses were offered by any of the appellants.  Prior to the jury deliberations, the appellants renewed their Rule 29 motions, which the court once again denied.

## C. Guilty Verdicts and Sentences

On March 17, 2004, the jury found all three appellants guilty on both counts, thereby concluding that the members of the conspiracy had knowingly and intentionally possessed and distributed at least five kilograms of cocaine, one kilogram of heroin, and a detectable amount of marijuana.  In sentencing the

---

of Santiago by members of the police force.  According to Giraud, the body had decomposed, the cranium had a bullet hole on the left side of the head, and the corpse was surrounded by male clothing and bullet casings from a .38-caliber revolver.

Alvarado's testimony pertained primarily to the murder of Alex Torres Franco on September 16, 2001.  Alvarado said that he was called to an activity hall in Las Palmas where a Sweet 15 party had been held prior to the shooting.  Based on the location of a spent bullet and the blood stains at the crime scene, Alvarado believed that Torres Franco was outside of the activity hall when he was shot.

defendants, the district court took into account the murders described by the witnesses, concluding that they were committed in furtherance of the conspiracy.  Thus, pursuant to the Sentencing Guidelines, the court found that the base offense level for each defendant was forty-three and that, accordingly, the applicable Guidelines sentence was mandatory life imprisonment. See U.S.S.G. § 2D1.1.[9]  Because the defendants were sentenced after United States v. Booker, 543 U.S. 220 (2005), the district court treated the Guidelines sentences as advisory rather than mandatory. United States v. Jiménez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc).  With the Guidelines sentences as the starting point, the district court made individualized assessments based on the factors listed in 18 U.S.C. § 3553. Id. at 518-19.  It concluded that each of the appellants should be given a sentence below the Guidelines sentence of life imprisonment.

Avilés, who had a Criminal History Category of I, was sentenced to a term of 360 months on Count One, the drug conspiracy charge, and a mandatory consecutive term of 60 months imprisonment on Count Two, the firearms charge.  Carrión, who had a Criminal History Category of IV, was sentenced to a term of 480 months on

_____

[9] Guidelines §2D1.1(d)(1) states: "If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder)."  Section 2A1.1 states that the base offense level for first degree murder is forty-three.

Count One and the mandatory consecutive term of 60 months on Count Two. Galiany, as the leader of a criminal activity involving more than five participants, was given a four-level upward adjustment pursuant to U.S.S.G. § 3D1.1(a). Taking into account Galiany's role as leader of the conspiracy, his Criminal History Category of II, the Guidelines sentence of life imprisonment, as well as the § 3553 factors, the court sentenced Galiany to 600 months of imprisonment for Count One and a mandatory consecutive term of 60 months of imprisonment for Count Two. The court imposed a five-year term of supervised released on each defendant for Count One and a concurrent three-year term of supervised release on Count Two. The defendants now appeal their convictions and sentences.

**II.**

We begin with an assessment of Carrión's arguments on appeal. Carrión challenges both the admissibility of certain critical evidence and the sufficiency of the evidence used to convict him. Before assessing his sufficiency challenge, we must first assess his challenge to the admissibility of what the government characterizes as admissible co-conspirator testimony. Our resolution of this challenge affects the body of evidence we evaluate in considering his sufficiency challenge.

**A. Co-Conspirator Hearsay Exception**

Carrión argues that portions of Bonilla's and Torres's testimony were improperly admitted into evidence because they

-14-

contained inadmissible hearsay. Under Federal Rule of Evidence 801(d)(2)(E), out-of-court statements may be offered for the truth of the matter asserted if the party offering the statements, here the government, establishes by a preponderance of the evidence that "a conspiracy embracing both the declarant and the defendant existed, and that the declarant uttered the statement during and in furtherance of the conspiracy." United States v. Bradshaw, 281 F.3d 278, 283 (1st Cir. 2002). To establish that a conspiracy embracing both the declarant and the defendant existed, extrinsic evidence is needed because "coconspirator statements are not deemed self-elucidating."[10] United States v. Piper, 298 F.3d 47, 52 (1st Cir. 2002) (stating that the "the proponent [of the statement] must present [extrinsic] evidence sufficient to delineate the conspiracy and corroborate the declarant's and the defendant's roles in it").

Carrión identifies eight statements as inadmissible hearsay on the ground that the government failed to establish the conditions for admissibility by a preponderance of the evidence. He objected to about half of the statements at the time they were offered, but the court overruled his objections. At the close of evidence, Carrión did not renew his objections.

---

[10] However, we need not rely on extrinsic evidence when considering whether the government has met its burden of establishing that a statement was made during and in furtherance of the conspiracy. Piper, 298 F.3d at 52 (specifying that only the "first half of this two-part requirement demands the introduction of extrinsic evidence").

-15-

We have previously explained that to properly preserve an objection to the admission of evidence under the co-conspirator hearsay exception, "a defendant must ordinarily object both when the hearsay statements are provisionally admitted and again at the close of all the evidence." United States v. Newton, 326 F.3d 253, 257 (1st Cir. 2003); see also United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977). This second objection permits the court to make its final Petrozziello determination.[11] Carrión claims he properly preserved his objections because he made a timely and standing objection to the admission of such statements. He further argues that in light of the court's denial of his Rule 29 motions, he did not need to request a Petrozziello determination at the close of all of the evidence because to do so would have been a "hollow formality."

We disagree. Our precedent clearly establishes that to preserve a hearsay objection to the admission of a co-conspirator's statement, the objection must be renewed at the close of all of the evidence. United States v. Perez-Ruiz, 353 F.3d 1, 12 (1st Cir. 2003); Newton, 326 F.3d at 257. We therefore review admission of

---

[11] If a defendant requests a Petrozziello determination -- a decision as to whether it is more likely than not that the declarant and the defendant were co-conspirators and that a given statement was made in furtherance of a conspiracy -- the trial court does not have to make its final determination until the close of all of the evidence. Newton, 326 F.3d at 257. The trial court can provisionally admit statements and then assess, once all of the evidence has been presented, whether the government has met its burden for admitting statements under Rule 801(d)(2)(E). Id.

the challenged hearsay statements for plain error. United States v. Colon-Diaz, 521 F.3d 29, 33 (1st Cir. 2008) (stating that we review unpreserved errors for plain error). Under this standard, we may reverse a defendant's conviction only if (1) an error occurred, (2) the error was clear and obvious, (3) it affected the defendant's substantial rights, and (4) it seriously impaired the fairness, integrity, or public reputation of the proceedings. Perez-Ruiz, 353 F.3d at 9.

We first assess whether the district court committed plain error when it decided that there was sufficient extrinsic evidence to support a finding by a preponderance of the evidence that a conspiracy embracing both the declarants and Carrión existed. Engaging in this case-specific inquiry, we find that there was adequate evidence to support the district court's determination that Carrión was conspiring with Torres and Galiany. Bonilla testified that he saw Carrión in the back seat of Galiany's car with two AK-47s. Torres testified that he drove a group including Carrión from the scene of the Las Palmas shooting on March 16, 2001 and then to retrieve their weapons the following day. In addition, after they picked up their weapons, Torres testified that he observed Carrión cleaning his guns at Galiany's house while others were packing drugs. Collectively, this testimony constituted adequate extrinsic evidence of Carrión's

involvement in a conspiracy with Torres and Galiany to meet the preponderance of the evidence standard.

We now turn to the eight statements that Carrión claims should have been excluded from evidence as inadmissible hearsay to determine if there was any plain error in the admission of these statements as being made during and in furtherance of the conspiracy.

1. <u>Torres's statement at trial that Galiany let Carrión stay stuck in jail even though "whenever Galiany needed Juan, Juano never said no to helping shoot it out or to blast someone"</u>

This statement cannot properly be characterized as hearsay because Torres was not recounting an out-of-court statement. When Torres was talking about "Juano" in jail, Torres was merely testifying about his experiences in the conspiracy and the generalized knowledge he acquired while in it. The statement was admissible without reliance on any evidentiary exception. <u>See</u> <u>United States</u> v. <u>Flemmi</u>, 402 F.3d 79, 93 n.21 (1st Cir. 2005) (explaining that when a witness testifies from his own experience, rather than recounting prior oral or written assertions, his testimony is not hearsay).

2. <u>Bonilla's testimony that Galiany told him in early March 2001 that he, Carrión, and a co-defendant "were looking for Cuquito from Las Palmas to kill him"</u>

We have previously explained that "[i]t is immaterial that the other person in the conversation, [Bonilla], . . . was not a coconspirator but a government informant" as long as the

testimony met Rule 801(d)(2)(E)'s foundational requirements. Colon-Diaz, 521 F.3d at 36 n.3. In other words, it is only necessary to show that Galiany was furthering the conspiracy when he made this statement to Bonilla. Id. at 35-36; see also Piper, 298 F.3d at 53 (explaining that an alleged co-conspirator's statements to an undercover DEA agent were admissible against the defendant because the alleged co-conspirator thought he was advancing the conspiracy by selling drugs to the undercover agent); United States v. Flores-Rivera, 56 F.3d 319, 330 (1st Cir. 1995) (explaining that the declarant's statement to an undercover agent was admissible under Rule 801(d)(2)(E) because the declarant thought the agent was a loyal co-conspirator and was sharing the information because he wanted to promote the undercover agent within the conspiracy).

Our precedent clearly establishes that informing co-conspirators of the activities of the conspiracy's members furthers the conspiracy. See United States v. Sepulveda, 15 F.3d 1161, 1180 (1st Cir. 1993) ("We think it is common ground -- and common sense -- that the reporting of significant events by one coconspirator to another advances the conspiracy."). Carrión does not challenge this proposition. Instead, he argues that the statement from early March 2001 is inadmissible because Galiany did not view Bonilla as a co-conspirator at the time the statement was made. Carrión contends that "it could hardly advance the objectives of the

-19-

conspiracy to alert a former police officer, not part of the conspiracy, to a planned murder." Therefore, according to Carrión, the statement cannot be considered to be in furtherance of the conspiracy on the ground that it served to keep its members informed.

We reject Carrión's argument. As planned with the police, Bonilla was posing as a co-conspirator. Working as a merchant who regularly acted as Galiany's pawn broker, Bonilla served a vital ancillary role to the conspiracy by providing liquidity for material assets as well as providing needed goods. See United States v. Garcia-Torres, 280 F.3d 1, 4 (1st Cir. 2002) ("[A] drug conspiracy may involve ancillary functions (e.g., accounting, communications, strong-arm enforcement), and one who joined with drug dealers to perform one of those functions could be deemed a drug conspirator."). Bonilla testified that in mid-March, a few weeks after Galiany told him about his intent to kill "Cuquito," Galiany invited Bonilla to accompany members of the drug organization as they rode around to the various drug points controlled by the organization and as they packed drugs at Galiany's house. By that time, it is apparent that Bonilla was regarded as a co-conspirator by Galiany. Galiany's sharing of pertinent information with Bonilla in the beginning of March, several weeks earlier, strongly indicates that even then Galiany viewed Bonilla as a co-conspirator. Therefore, it was not plain

-20-

error for the district court to take that view of the evidence and admit the statement under Rule 801(d)(2)(E).

        3. <u>Bonilla's testimony that Galiany said on March 21, 2002, the Uzi is "Juano's and now I am responsible for it. I have to respond for it" and then demanded Bonilla "give him $3,000 for the Uzi because it was Juano's"</u>

Galiany had given an Uzi to Bonilla for safekeeping. Bonilla and the FBI agents with whom he was working decided to have the gun seized and to detain Bonilla overnight in order to give the impression that Bonilla had been jailed for possessing the Uzi. The day after Bonilla's release, March 21, 2002, Galiany came to Bonilla's house and said that the Uzi was "Juano's" and he had to respond for it. Galiany then demanded $3,000 from Bonilla to cover the cost of replacing the Uzi. Galiany said to Bonilla that he "had to get him $3,000 for the Uzi because otherwise Juano would have killed" Galiany.

According to Carrión, Galiany suspected Bonilla of being an informant, and the statement regarding the Uzi was made to harm Carrión, Galiany's rival, rather than to further the conspiracy. However, Carrión offers minimal support for this theory. It is also possible that Galiany was demanding money from Bonilla to replace Carrión's Uzi because Carrión, as an enforcer for Galiany's conspiracy, needed a weapon to carry out his job. As the leader of the conspiracy, Galiany may have felt responsible for replacing Carrión's weapon by virtue of his role as the head of the organization and therefore was furthering the conspiracy by making

-21-

this demand of Bonilla. Even if Galiany wanted to replace the Uzi because he was fearful of Carrión, this does not necessarily weigh against the characterization of Galiany and Carrión as co-conspirators because co-conspirators can turn against each other over the loss of a precious gun. Therefore, it was not plain error for the district court to admit Bonilla's testimony recounting Galiany's statements.

4. Torres's testimony that "once [Galiany] went to my house to ask me for my car, to borrow my car to go shoot Joel Moreno"

Carrión challenges the admissibility of this statement on the ground that it was just "idle chatter" and not a statement that furthered the conspiracy. We disagree. Although the government does not allege that the shooting of Moreno was an overt act in furtherance of the conspiracy, the attempt to kill a member of a rival drug organization advances the conspiracy's interests. Obtaining a car was an integral step in executing the rival. Therefore, Galiany's request was in furtherance of the conspiracy and admissible under Rule 801(d)(2)(E).

5. Torres's testimony that Galiany and three co-defendants said that "they had found Joel Moreno and that they had shot him"

This statement was made by Galiany and co-defendants Flores, Roberto Torres-Ruiz, and Rafael Ortiz-Luna when they were returning the car to Torres. Carrión argues that this statement should not be admissible because Torres was not part of the

conspiracy at the time and because this statement involved historical information and was also "idle chatter." However, the facts indicate otherwise. We have previously established that Torres was a co-conspirator for the purpose of 801(d)(2)(E). The statements made by Galiany to keep Torres abreast of the conspiracy's activities were in furtherance of the conspiracy. <u>See Sepulveda</u>, 15 F.3d at 1180. As such, they can hardly be characterized as "idle chatter."

6. <u>Torres's testimony that Galiany said Carrión, Avilés, and Flores had "shot one of the Las Palmas persons" when they had "shot in a car jam . . . coming from a field day" and that Carrión and Avilés "had gotten off the truck and they had shot the car up;" Torres also said that he overheard Galiany, Carrión, Avilés, and Flores discussing that they heard women inside the shot-up car.</u>

According to Torres's testimony, this conversation took place on March 16, 2001, the day that Maldonado, a member of Las Palmas, was killed. Again, we have one co-conspirator informing another co-conspirator of events important to the conspiracy. Torres's testimony is admissible under Rule 801(d)(2)(E).

7. <u>Torres's testimony that he was told by Galiany to take Avilés, Carrión, Flores, and Galiany "to pick up the weapons that had been used" in the shooting</u>

On March 17, 2001, Galiany called Torres requesting that he pick up Avilés, Carrión, and Flores at Avilés's home. Galiany accompanied Torres and the other men as they went to retrieve the weapons from the river in Coamo. This statement made by Galiany was in furtherance of the conspiracy because Torres was being asked to drive Avilés, Carrión, Flores, and Galiany to La Juaca to

-23-

retrieve weapons and then to bring the same group back to Galiany's house.  To accomplish this, Galiany had to tell Torres the reason for their trip.

8. Torres's testimony that he heard Avilés, Carrión, and Flores say that Flores had "picked up the weapons from the river where [Flores] had left them"

This statement by Avilés, Carrión, and Flores was made on March 17, 2001 while Torres was driving Galiany, Avilés, Carrión, and Flores to Galiany's house after their stop at the river.  Like the earlier statements, this statement was properly admitted because it was a statement that furthered the conspiracy by keeping the various members informed of the conspirators' activities.

In summary, we conclude that there was no plain error in the admission of the co-conspirator testimony.  With that issue resolved, we turn to Carrión's challenge to the sufficiency of the evidence, understanding that these co-conspirator statements described by Bonilla and Torres are included in the evidence subject to the sufficiency analysis.

## B. Sufficiency of the Evidence

Carrión claims that the district court erred in denying his Rule 29 motion for a judgment of acquittal because no reasonable jury could find beyond a reasonable doubt that he agreed to join the drug conspiracy alleged in the indictment.  Carrión argues that at most the evidence supports a finding that he worked

-24-

as a "hired gun" for Galiany rather than as a loyal member of the conspiracy.  We review the district court's denial de novo, viewing the evidence in the light most favorable to the guilty verdict and considering whether a reasonable factfinder could have found the appellant guilty beyond a reasonable doubt.  United States v. Irizarry, 404 F.3d 497, 503 (1st Cir. 2005).

Carrión emphasizes that there was no evidence of his participation in any aspect of Galiany's drug conspiracy because he did not obtain, sell, transport, process, package, or even benefit from the sale of drugs.  However, the government did provide evidence of Carrión's role as triggerman and enforcer for Galiany's conspiracy.  As recounted above, Bonilla testified that he saw Carrión on several occasions wielding a gun, including an instance in which Galiany explicitly said they were looking for "Cuquito" so they could kill him.  Torres also was aware of Carrión's role as an enforcer and testified that on March 16, 2001, he had brought Carrión, among others, to a beach to wash off gunpowder.  On that occasion, he heard Galiany say that Carrión and Avilés had shot at the car of a Las Palmas person.  The following day Torres drove the same group to a river to retrieve the stashed weapons and then observed Carrión cleaning his gun at Galiany's house while others were packing cocaine and heroin.

Since Galiany's gang was often at war with other drug organizations over drug "turf," his role as "triggerman" and

"enforcer" was instrumental to the continuing success of the conspiracy. Garcia, 280 F.3d at 4 (explaining that a drug conspiracy may involve ancillary functions and those who perform any of those functions could be drug conspirators). Galiany's concern about accounting for Carrión's Uzi, as testified to by Bonilla, may have stemmed from Galiany's interest in having Carrión, a key triggerman, well-equipped. Such a view would be consistent with Galiany's instructions to Torres that he should kill Santiago in order to protect Carrión and consistent with Torres's observation that Carrión had been unwavering in his loyalty to Galiany, never saying no to one of Galiany's requests.

This evidence was sufficient to permit a reasonable jury to conclude beyond a reasonable doubt that Carrión was part of Galiany's conspiracy and not merely a "hired gun." Therefore, Carrión was not entitled to a judgment of acquittal. Fed. R. Crim. P. 29.

## C. **Brady violation**

About a year and a half after the trial in this case, Carrión was tried on federal charges stemming from his alleged leadership role in a sixty-six person conspiracy to distribute drugs between 1998 and 2005. In the course of this second trial, the government released a copy of a Drug Enforcement Administration ("DEA") report memorializing information provided on October 12,

-26-

2001 by an unnamed confidential informant.  According to the report, the informant

> stated that a few years ago, he met Jose GALIANI-CRUZ aka "CATAÑO" through aka "RUBENCITO".  [The informant] stated that he sold a mini .14 rifle, a 9mm, an AK-47, a shotgun, a .40 caliber pistol and a 30-30 assault rifle to GALIANI-CRUZ.  GALIANI-CRUZ [t]hen tried to take over CARRION-TORRES'S drug points and a war started between them.

Carrión also obtained a copy of another DEA report that was used in a case against Joel Moreno, Galiany's rival, and other Las Palmas residents.  In this second undisclosed DEA report, dated March 11, 2002, the informant said that Moreno was a member of a drug trafficking organization in Las Palmas, Coamo, and "an associate of Enrique and Juanito [Carrión], who also have drug points in Coamo and Santa Isabel."  This second report also said that "approximately two weeks ago, [the informant] witnessed when Juan Carrion-Torres, aka: 'Juano' exited a black Cherokee and began shooting at Cataño's [Galiany's] car in the Urbanization San Luis."

Upon becoming aware of these DEA reports, Carrión filed a motion for a new trial in this case on the ground that the DEA reports were exculpatory evidence that the prosecutor had an obligation to disclose under Brady.[12]  The district court found that Carrión had not adequately demonstrated that the failure to make a

_____

[12] Carrión had previously filed the appropriate discovery motions in which he asked for all exculpatory and impeaching evidence, including reports prepared by the FBI, DEA, and other law enforcement agencies.

timely disclosure of these DEA reports entitled him to a new trial.

It explained its reasoning as follows:

> First, the information contained therein is cumulative evidence as to a war existing between the defendants, since it echoes testimony given by Torres-Martinez and Bonilla. Evidence of the feud between Carrion-Torres and Galiany-Cruz was presented at trial when Bonilla testified that Torres-Martinez had told him [in 2004] that Carrion-Torres was out to kill Galiany-Cruz, and when Torres-Martinez testified that Carrion-Torres was no longer with Galiany-Cruz by March 2002. So, evidence to the effect that Carrion-Torres and Galiany-Cruz were enemies at one point was presented to the jury. . . . The new evidence would only alter the possible start date of the feud but even if believed by the jury, it does not exculpate defendants from their illegal actions.

United States v. Galiany-Cruz, Crim. No. 03-083 (JAG), 2006 U.S. Dist. LEXIS 95590, at *11 (D.P.R. Mar. 7, 2007) (internal citations omitted). Carrión appeals the district court's denial of his motion, which we review for abuse of discretion. United States v. Maldonado-Rivera, 489 F.3d 60, 65 (1st Cir. 2007).

The essential elements of a Brady claim are well-established: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999); see also Banks v. Dretke, 540 U.S. 668, 691 (2004). In analyzing whether there was a Brady violation, "[w]e evaluate the strength of the impeachment evidence and the effect of its suppression in the context of the entire record to determine its materiality." United States v.

Conley, 415 F.3d 183, 189 (1st Cir. 2005). The import of withholding evidence is heightened "where the evidence is highly impeaching or when the witness' testimony is uncorroborated and essential to the conviction." Id. (quoting United States v. Martinez-Medina, 279 F.3d 105, 126 (1st Cir. 2002)). "Suppressed impeachment evidence is immaterial under Brady, however, if the evidence is cumulative or impeaches on a collateral issue." Id. We must grant a new trial if, after assessing the significance of the non-disclosed evidence in the context of the trial, "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Strickler, 527 U.S. at 290 (quoting Kyles v. Whitley, 514 U.S. 419, 435 (1995)).

In its Memorandum and Order denying Carrión's motion for a new trial, the district court misstated at one point in its analysis the legal standard for determining whether the DEA reports were material. It said that the suppressed evidence "does not rise to the level of materiality that would be likely to cause a different result at a new trial." Galiany-Cruz, 2006 U.S. Dist. LEXIS 95590, at *16 (emphasis added). However, to establish the materiality of a Brady violation, the defendant need only demonstrate that there was a reasonable probability of a different outcome, which is "shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"

-29-

Kyles, 514 U.S. at 434 (internal citations omitted) (quoting United States v. Bagley, 413 U.S. 667, 678 (1985)). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. There is a meaningful difference between the burden of establishing the likelihood of a different result at a new trial and the burden of establishing a reasonable probability of a different outcome. That said, the district court did cite the proper standard earlier in its opinion, noting that the defendant must show that the "evidence is of such probative value that there is a reasonable probability it would produce a different result." Galiany-Cruz, 2006 U.S. Dist. LEXIS 95590, at *4.

We need not decide whether the district court ultimately applied the wrong standard to the Brady issue because the district court's refusal to grant a new trial on the basis of the Brady violation cannot stand in any event. As we shall explain, the DEA reports, or evidence developed on the basis of the DEA reports, could have been important for impeachment purposes at trial by helping Carrión advance his defense that he was not part of Galiany's drug conspiracy but rather a member of a rival conspiracy.

The first DEA report, dated October 12, 2001, states that a "few years ago a war started" between Carrión and Galiany. The report does not address the specific time frame of the war, indicating neither that the war had ended nor that it was ongoing. Yet, even this general information regarding a war between Galiany and Carrión would have undermined Bonilla's testimony that Carrión was loyal to Galiany as of March 2001. It also would have challenged Torres's testimony that Galiany had Santiago killed in the fall of 2001 in order to protect Carrión and that "whenever Galiany needed Juan, Juano never said no." This is not to say that Bonilla and Torres could not have offered testimony refuting the existence of a war between Carrión and Galiany or, alternatively, explaining how the rivals became co-conspirators. However, whether the witnesses could have explained away the discrepancies if the evidence had been disclosed is beside the point. Carrión had a right to use the DEA report, or evidence derived therefrom, to impeach key witnesses in mounting a defense against the conspiracy charges.

The second DEA report, dated March 11, 2002, stating that Carrión shot at Galiany's car in late February, further undermines Torres's and Bonilla's testimony. Bonilla testified that on March 21, 2002, Galiany said that he was responsible for "Juano's" Uzi and demanded that Bonilla pay $3,000 for Carrión's lost Uzi. The evidence that Carrión shot at Galiany's car less than two weeks

earlier casts doubt on the veracity of this testimony by diminishing the likelihood that the two men were working together and that, consequently, Galiany would feel obliged to account for the missing Uzi.

Furthermore, an audiotape of a conversation between Torres and Bonilla, recorded on March 27, 2002, was offered into evidence in which "Juano" was said to be working with Galiany's rivals. Torres testified that by this point Carrión and Galiany were at war because Galiany had failed to bail Carrión out of jail despite Carrión's unwavering loyalty. Without the DEA reports or evidence derived therefrom, the jury had no knowledge of the apparent animosity between the two men preceding the bail incident described by Torres. However, the DEA reports collectively depicted a longstanding "war" between them, undermining Torres's explanation for the conflict and strengthening Carrión's defense that he was not part of a conspiracy with Galiany.

While the government concedes that the "undisclosed evidence bears directly on whether Carrión was part of . . . Galiany's drug conspiracy," it argues that the DEA reports are merely cumulative because there was evidence presented at trial in support of a feud between Galiany and Carrión. However, the testimony at trial advances a narrative in which Carrión was a loyal solider up until the point that Galiany left him in jail on March 22, 2002. Only then, according to the government's theory,

did Carrión leave the conspiracy and become a vindictive rival. By contrast, the DEA reports support Carrión's contention that he was not a member of the conspiracy during any of the time period covered by the indictment, December 2000 to March 2003. In addition, they raise doubts as to the credibility of Torres and Bonilla. This impeaching evidence is particularly weighty here because, as Carrión asserts, "there is no forensic evidence, eyewitness identification, statement, seized evidence or anything else to tie Appellant to this conspiracy[;] the verdict depends entirely upon whether the jury believed the testimony about Appellant provided by Bonilla and Torres." See Martinez-Medina, 279 F.3d at 126 (stating that impeachment evidence can warrant a new trial "when the witness' testimony is uncorroborated and essential to the conviction").

Although we have previously characterized the standard for ordering a new trial due to a Brady violation as "delphic," we have no trouble determining the proper outcome here. See Sepulveda, 15 F.3d at 1220. The DEA reports, which described ongoing hostility between Carrión and Galiany prior to and during the period of the alleged conspiracy, undermine the testimony of the key witnesses in the government's case against Carrión. Under these circumstances, the DEA reports establish a reasonable probability that the results of Carrión's trial would have been different if the DEA reports had been disclosed to the defense in

a timely manner.[13]  We therefore vacate Carrión's conviction and sentence.[14]

_____

[13] Carrión also challenges the testimony of Agent Gil on the ground that it was overview testimony in violation of United States v. Casas, 356 F.3d 104, 119-20 (1st Cir. 2004).  While on the stand, Agent Gil identified the members of the Cataño gang and their respective roles, and provided a chart summarizing that information.  Agent Gil did not limit his testimony to what he saw, but rather gave his conclusion that this defendant was a member of the conspiracy.  Agent Gil went far beyond merely setting the table for the jury by explaining that there was an investigation of the defendant and what steps were taken pursuant to the investigation, with care being taken not to infringe the defendant's confrontation or other rights.  We expressed our concerns about such testimony in Casas, which was published three months before this trial.  This case raises some of the same problems with overview testimony that we cited in Casas, particularly the use of overview testimony by a government agent to endorse the testimony of other witnesses, who testify from personal knowledge about the involvement of the defendant in the conspiracy, and thereby add the imprimatur of the government to those witnesses' testimony.  It is troubling to us that the government's use of the overview testimony indicates an unawareness of our decision in Casas.  Although we do not rely on this overview testimony to find that there was Brady prejudice, that overview testimony does contribute to our unease with the jury's verdict against Carrión.  Moreover, Carrión raises a litany of other alleged prosecutorial errors, including inappropriate appeals to the jury's emotions, improper vouching, and bolstering. As we shall discuss in the context of Galiany's claims, there was an improper appeal to the emotions of the jury in the government's opening statement.  With respect to Carrión, that error also contributes to our unease with the jury's verdict against him, but it is not necessary to our Brady analysis.

[14] Although the government does not concede Brady error in its brief on appeal, the government acknowledges that "the undisclosed evidence bears directly on whether Carrión was part of Galiany's drug conspiracy."  The government then adds: "As the district court noted in its opinion and order, the new information provides a new start date as to the disassociation between Galiany and Carrión. Should this court find the need to further explore the possible significance of this evidence, it should remand the case against Carrión to the district court for an evidentiary hearing as opposed to ordering a new trial."  We disagree with the government's suggestion of remand for an evidentiary hearing when we and the

-34-

We now turn to Galiany's claim that his conviction should be reversed because of the improper admission of hearsay evidence at trial, a <u>Brady</u> violation, and other prosecutorial misconduct.[15]

**A. Hearsay Objections**

Galiany raises four hearsay objections, all of which are raised for the first time on appeal and thus reviewed for plain error. <u>Flemmi</u>, 402 F.3d at 94. He challenges the following four statements on the ground that Torres was not a member of the conspiracy at the time that these statements were made and, therefore, these statements cannot be properly characterized as advancing the conspiracy by keeping its members informed.

1. <u>Torres's and Bonilla's discussion of Galiany's handling of Carrión's Uzi</u>

Statements made by Torres about Galiany's handling of Carrión's Uzi were recorded on March 27, 2002 by Bonilla and were offered into evidence when Torres was on the stand at the trial. As we discussed in the context of Carrión's claims, statements made to further a conspiracy by keeping co-conspirators informed of the conspiracy's activities can properly be admitted under Rule 801

_____

district court have focused on the same <u>Brady</u> material and reached divergent conclusions on its legal significance.

[15] Galiany does not appeal the denial of his Rule 29 motion for a judgment of acquittal.

(d)(2)(E) if the conspiracy encompasses the declarant (here Torres) and the defendant.

Galiany argues that these particular comments on the recording should not be admissible as a co-conspirator statement because Torres was not a member of the conspiracy on March 27, 2002. Galiany cites Torres's testimony that he ceased to be a runner after January 2002, at which point he sought to distance himself from the organization. However, while testifying, Torres provided extensive information regarding the Cataño gang's internal conflicts and plans at the time of the recording, displaying knowledge that an outsider who had left the conspiracy would be unlikely to have. We thereby find it was not plain error for the district court to allow this evidence to be admitted under Rule 801(d)(2)(E).

Moreover, we reject Galiany's claim that the recording and the accompanying discussion of the Uzi by Torres on the witness stand were cumulative or unfairly prejudicial under Federal Rule of Evidence 403 simply because Bonilla had previously testified as to Galiany's involvement with an Uzi owned by Carrión. It was appropriate for the government to offer evidence from more than one witness to prove Galiany's participation in the conspiracy.

2. <u>Torres's testimony that Galiany had asked to borrow his car so that he could go shoot Joel Moreno and then reported to Torres that he had successfully completed the murder</u>

While on the witness stand, Torres testified that Galiany made these statements to him. We need not assess whether these statements are admissible against Galiany as co-conspirator statements because they are admissible under Federal Rule of Evidence 801(d)(2)(A). Under this rule, an out-of-court statement is not hearsay if it is offered against the party and it is the party's own statement. Fed. R. Evid. 801(d)(2)(A); <u>see</u>, <u>e.g.</u>, <u>United States</u> v. <u>Garza</u>, 435 F.3d 73, 77 (1st Cir. 2006).

3. <u>Torres's testimony that Galiany said Carrión and Avilés had a shot a member of Las Palmas</u>

Rule 801(d)(2)(A) also applies here because Galiany's statement is being offered against him. Fed. R. Evid. 801(d)(2)(A). As an evidentiary matter, it is irrelevant that this evidence points an accusing finger at Avilés and Carrión. The statement, by its terms, does not have to be against the interest of Galiany. The fact that it was a statement by Galiany and there was an attempt to use it by a party opponent, the government, is sufficient to get the statement in under 801(d)(2)(A).

For these reasons, we find that the district court did not commit plain error when it admitted the above statements into evidence.

## B. <u>Brady</u> Claim

Galiany, like Carrión, argues that the prosecutor failed to disclose exculpatory evidence in violation of <u>Brady</u>. The material in question is a DEA report dated February 15, 2002, which includes a statement by a confidential informant to the effect that Julio Rivera-Rodriguez ("Rivera") was responsible for Santiago's murder. According to the confidential informant, Rivera wanted to kill Santiago because Santiago was causing trouble for two other men who presumably were Rivera's allies.[16] Galiany claims that the government's failure to make a timely disclosure of this DEA report constituted a <u>Brady</u> violation because it conflicted with Torres's testimony that Galiany had ordered that Santiago be killed to protect Carrión. We reject this contention.

Galiany is charged with participating in a drug conspiracy; the murder of Santiago is simply alleged as one of a number of overt acts in furtherance of this conspiracy. There is a great deal of evidence implicating Galiany in the drug conspiracy, and other murders in furtherance of that conspiracy, apart from the evidence relating to Santiago. For example, Bonilla on several occasions had recorded conversations with Galiany, which were introduced as evidence at trial. These recordings captured Galiany discussing drug processing and sales as well as the weapons

---

[16] The record contains no other information regarding Rivera. Therefore, we are unable to ascertain whether he was a member of any of the aforementioned gangs.

he owned and sought to acquire.  More specifically, Galiany states that he was processing one eighth of a kilogram of cocaine so it could be sold.  On a later occasion, Galiany discusses with one of his drug sellers that the seller's "teeth felt like they wanted to fall off because the drugs was so good."  Galiany then indicates that he had a "quarter" of that same drug, offering to shoot-up Bonilla so he could taste it.

On yet another occasion, Galiany boasts that he "had shot at Nelson [a rival drug pusher] and he had torn his van apart with bullets."  According to Galiany, during the shooting "we shot from the distance, and even the cement flew."  Galiany says that Torres had disappointed him by failing to kill Nelson at an earlier time.  Because of Torres's failed assassination attempt, Galiany says that he "was going to change; that he [who] was beside him was going to get, you know, money from the drugs and he who wasn't beside him was -- you know, he was going to bust them, he was going to kill them."  Given this highly incriminating evidence of Galiany's involvement in the distribution of drugs and his use of weapons and the threat of violence to advance and protect that distribution, our confidence in the verdict is unshaken by the information in the DEA report.

Moreover, the appellants, including Galiany, were able to challenge Torres's credibility even without the DEA report.  The appellants effectively highlighted discrepancies between Torres's

grand jury and trial testimony and the reasons that Torres may have been motivated to testify untruthfully, such as a desire to obtain a reduced sentence in exchange for helping secure the appellants' convictions. In this sense, the additional impeaching evidence was only cumulative.

## C. Additional Claims of Prosecutorial Misconduct

Galiany asserts that the prosecutor made several other errors that denied him a fair trial, including making inflammatory statements, delaying disclosure of important evidence, and improper vouching. Galiany concedes the standard of review is plain error. United States v. Sanchez-Berrios, 424 F.3d 65, 73 (1st Cir. 2005).

### 1. Improper Statements and Questioning

Galiany claims that the prosecutor twice sought to sway the jurors by appealing to their emotions. In his opening statement, the prosecutor made the following comment:

> This case is about drugs and violence that we read about in the newspaper everyday and we hear about on the television when we go home at night; the same violence which occurs in Puerto Rico on a daily basis and which takes the lives of hundreds of young people each year.

We have previously said that it is improper to appeal to the "jury's emotions and role as the conscience of the community." Martinez-Medina, 279 F.3d at 119. Although it was inappropriate for the prosecutor to link the drugs and violence at issue here to the problems of drugs and violence in Puerto Rico generally, it is

-40-

unlikely that this isolated comment prejudiced the outcome of the trial.  Id. ("[I]t seems to us highly implausible to think that this isolated epithet altered the jury's verdict.").

Galiany also claims that the government improperly appealed to the jury's emotions by eliciting superfluous details from Bonilla about his two gunshot wounds.  According to Galiany, the prosecutor was trying to bolster Bonilla's credibility by offering testimony highlighting Bonilla's past heroism.  As we have indicated, the standard here is plain error because Galiany did not object to this testimony at trial.  Even if the testimony cited by Galiany were not permissible background evidence (and we take no view on this), any error was not plain, nor has he shown the requisite prejudice or a miscarriage of justice.[17]

2. Vouching

"A prosecutor improperly vouches for a witness when she places the prestige of her office behind the government's case by, say, imparting her personal belief in a witness's veracity or implying that the jury should credit the prosecution's evidence simply because the government can be trusted."  Perez-Ruiz, 353

---

[17] Galiany is also correct that there were two factual misstatements in the opening statement: a slight overstatement of Torres's sentence and a misrepresentation of when Torres began to work with Galiany.  Both of these factual inaccuracies were minor and corrected when Torres testified.  Martinez-Medina, 279 F.3d at 119 (finding no prejudice where "[a]ny factual inaccuracies were minor, [and] related to peripheral issues").

F.3d at 9. Galiany contends that the prosecutor improperly vouched for Torres by asserting in his opening statement that the government was "fortunate enough to be able to present to you the testimony of an individual who for a period of time was a member of the 'Cataño' gang" and that Torres's criminal history did not "take away from his credibility." He claims that the prosecutor's comments "carr[y] the subliminal message to the jury that their main witness's testimony is truthful because had it not been that way the United States would not have prosecuted."

This claim has no merit. The challenged statements simply refer to the basis for the witness's knowledge while seeking to deflect the anticipated impeachment. These comments do not lend the government's prestige to the witness any more than would be true for any government witness in a criminal case.

Galiany also claims that the prosecutor engaged in improper vouching for Torres when he said the following: "In telling the truth through his testimony, he's trying to get his life back in order, and he's trying to hopefully get a lower sentence, if the Court would so do that through his assistance." We have held similar statements permissible because the prosecutor is simply explaining a witness's motive for telling the truth rather than providing a personal assurance. See, e.g., Martinez-Medina, 279 F.3d at 119 ("[T]hat cooperating witnesses had a motive to tell the truth because of the dire consequences of breaking

their plea agreements [] was also not improper vouching because it provided a reason, not a personal assurance, why the jury should believe the witnesses.").

### 3. Delayed Release of Report

Galiany argues that his due process rights were violated by the government's belated release of an FBI report from March 2003. He claims he should have received the report before the third day of the trial, March 24, 2004. According to Galiany, the report contained a statement by an eyewitness to the March 16, 2001 shooting of Maldonado. This witness said that, contrary to Torres's testimony, Galiany had not been at the scene of the shooting in Las Palmas.

When an exculpatory report has been delayed but not withheld, the pertinent inquiry is

> whether defendant's counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case. To prevail on this argument, the defendant must at a minimum make a prima facie showing of a plausible strategic option which the delay foreclosed.

United States v. Misla-Aldarondo, 478 F.3d 52, 63 (1st Cir. 2007) (internal quotations omitted). Galiany makes no such showing because he neither argues that a particular strategic option was foreclosed nor does he provide an explanation for why he did not request a continuance. See United States v. Smith, 292 F.3d 90, 102 (1st Cir. 2002) ("[W]e have noted that defense counsel must

typically request a continuance to preserve a claim of prejudice by delayed disclosure of evidence."). In fact, Galiany concedes in his brief that "[i]t is not evident from the record defense counsels' reason(s) for not addressing before the court the Government's delayed disclosure" of this report. Thus, his delayed disclosure claim is hopeless and we affirm Galiany's conviction.[18]

## IV.

Avilés raises two claims of plain error, both pertaining to the sufficiency of the jury's findings concerning the quantity of drugs allegedly involved in the conspiracy.[19] He argues that the district court wrongly denied his motion for judgment of acquittal because the government failed to prove that the conspiracy was responsible for the distribution of one kilogram of heroin, five kilograms of cocaine, and detectable quantities of marijuana.[20]

---

[18] Galiany also makes a cumulative error claim. Given our analysis of the discrete errors that Galiany has claimed, his cumulative error claim is unavailing.

[19] Avilés recognizes that he failed to raise these claims before the district court and therefore his claims are reviewed for plain error. Colon-Diaz, 521 F.3d at 33.

[20] Since Count One was conspiracy to possess and distribute controlled substances, the court first informed the jury of the elements necessary for a finding of a conspiracy. Then the court explained the elements necessary for a finding of possession and distribution:

> For you to find the defendant guilty of this crime, you must be convinced that the Government has proved each of the following beyond a reasonable doubt: First, that the defendant knowingly possessed a controlled substance; second, that the

-44-

However, the evidence provided ample support for the jury's decisions, including its drug quantity determinations. Torres testified that during his ten-month tenure as a runner for the conspiracy, he processed weekly an eighth of a kilogram of heroin, an eighth of a kilogram of cocaine, and a half-pound of marijuana. Therefore, Torres alone was responsible for processing five kilograms of heroin, five kilograms of cocaine, and twenty pounds of marijuana. Bonilla provided similar support for the charged drug quantities when he testified that he saw Galiany delivering "kilos" of drugs to his neighbor and processing an eighth of a kilogram of heroin. Furthermore, the parties stipulated that 1.56 grams of heroin and 61.12 grams of cocaine were seized at two of Galiany's drug points. Collectively, this information provided sufficient evidence for a reasonable jury to find the requisite amounts of drugs to support a conviction under 21 U.S.C. § 841(b)(1)(A).[21]

_____

substances were in fact heroin, cocaine, and/or marijuana; third, that the defendant possessed the substances with the intent to distribute; and fourth, that the quantity of the substance was at least one kilogram or more of heroin, five kilograms or more of cocaine, and a detectable amount of marijuana.

Based on these instructions, the jury returned a guilty verdict. The jury also completed a special verdict form, indicating that Avilés was guilty of conspiring to distribute one kilogram of heroin, five kilograms of cocaine, and a detectable amount of marijuana.

[21] Avilés argues that the jury instructions were flawed because of a discrepancy between the indictment's reference to "kilogram

Avilés further contends that he was convicted in violation of Apprendi v. New Jersey, 530 U.S. 466 (2000), because the verdict form did not explicitly state that the jury must find him guilty "beyond a reasonable doubt" of participating in a conspiracy that had the intent to distribute the quantities of drugs charged in the indictment. We have previously held that the verdict form need not explicitly state that the finding required is guilt beyond a reasonable doubt if the jury instructions conveyed the need to make the finding with that level of certainty. See Perez-Ruiz, 353 F.3d at 16 ("Absent either a special verdict form or a suitably focused jury instruction (requiring a finding beyond a reasonable doubt, that the appellant had knowingly participated in a conspiracy to distribute [the quantities of drugs charged]), the verdict did not cure the potential Apprendi problem." (emphasis added)). Here the jury instructions were suitably focused, stating that the charged offense and the associated drug quantities must be proven beyond a reasonable doubt; therefore, the verdict form did

---

quantities of marijuana" and the jury instructions' and verdict form's reference to a "detectable amount" of marijuana. This discrepancy is inconsequential because the indictment and jury instructions consistently listed the quantities of cocaine and heroin, which on their own were sufficient to trigger a statutory maximum of life imprisonment. See 21 U.S.C. § 841(b)(1)(A). Thus, the error was harmless.

not have to include such language.[22]  Consequently, we affirm Avilés's convictions.

## V.

Both Galiany and Avilés challenge their sentences on the ground that the district court erred when it considered three murders in calculating the Guidelines sentences.[23]  The jury's findings of guilt on Count One, the conspiracy to possess and distribute controlled substances, and Count Two, possession of firearms in furtherance of a conspiracy, subjected the defendants to a statutory term of imprisonment between ten years and life imprisonment.  21 U.S.C. § 841(b)(1)(A).  Under the Guidelines, if the court finds by a preponderance of the evidence that a murder was committed in furtherance of the conspiracy, the Guidelines base offense level is forty-three.  U.S.S.G. § 2D.1(d)(1) (when a victim

---

[22] After oral argument, Avilés filed a Motion to Adopt Co-Defendants' Argument pursuant to Rule of Appellate Procedure 28(i).  Avilés makes only bare-bones references to his co-appellants' arguments in his motion.  For example, in support of his assertion of prosecutorial misconduct, he merely cites to seven pages from Carrión's brief and three pages from Galiany's brief.  He does not provide any detailed argumentation explaining how the prosecutorial misconduct applies to him.  Thus, he is effectively "leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."  Casas, 425 F.3d at 30 n.2 (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)(internal quotation marks omitted)).  Because Avilés's references to his co-appellants' arguments are perfunctory, we deem those arguments waived.  Id.

[23] Although Carrión also challenges his sentence, we need not reach this issue because we are vacating his convictions and sentence.

-47-

was killed under circumstances that would constitute first-degree murder under 18 U.S.C. § 1111, the applicable base offense level is forty-three). The Guidelines provide for a mandatory life sentence when the base offense level is forty-three. However, in light of Booker, the Guidelines are only advisory.[24]

Here, the court found that three murders were committed in furtherance of the conspiracy and therefore the applicable base offense level was forty-three. The court noted that life imprisonment was the applicable Guidelines sentence. After considering the sentencing factors found in 18 U.S.C. § 3553, the court decided to give a below-Guidelines sentence.[25] See United States v. Rosado, 2008 U.S. App. LEXIS 8105, *8 (1st Cir. 2008) (explaining that consideration of the Guidelines range is not only "permissible but required" before giving a below-Guidelines sentence). The court sentenced Galiany to a 660-month term of

---

[24] As we have previously explained, the Guidelines were only advisory at Galiany's and Avilés's sentencing hearings because the sentencings took place post-Booker.

[25] Taking into account Galiany's role as leader of the conspiracy, his Criminal History Category, the Guidelines sentence of life imprisonment, as well as the § 3553 factors, the court sentenced Galiany to 600 months of imprisonment for Count One and a consecutive term of 60 months of imprisonment for Count Two, plus five years of supervised release.

Avilés, unlike Galiany, had a Criminal History Category of I, meaning that he had no prior felonies. Taking into account this history as well as the other § 3553 factors, Avilés was sentenced to 360 months imprisonment for Count One and a consecutive term of 60 months imprisonment for Count Two, totaling 420 months. Avilés was also sentenced to five years of supervised release.

imprisonment and a five-year term of supervised release and sentenced Avilés to a 420-month term of imprisonment and a five-year term of supervised release.

Galiany and Avilés challenge the court's determination on the ground that the murders on which the court relied -- the murders of Maldonado, Franco, and Santiago --  had not been proven by a preponderance of the evidence.  We need not reiterate the details of Torres's testimony regarding the context, time frame, and manner in which each of these men was killed and the relationship that those murders had to the conspiracy in order to reject Galiany and Aviles's challenge to the murder cross-reference.  Nor do we need to revisit Bonilla's corroboration of Torres's testimony regarding these murders.  That evidence amply supports the court's conclusion by a preponderance of the evidence that the murders had been committed in furtherance of the charged conspiracy.

Avilés challenges the constitutionality of applying a Guidelines murder cross-reference that could subject a defendant to life imprisonment when the facts justifying the sentence have been proven only by a preponderance of the evidence.  We once again reject this often raised argument because even the heightened sentence does not rise above the statutory maximum.  See, e.g., United States v. Gonzalez-Velez, 466 F.3d 27, 41 (1st Cir. 2006).

## VI.

For the reasons stated herein we affirm Galiany's and Avilés's convictions and sentences.  However, we vacate Carrión's convictions and sentence and remand for further proceedings.

So ordered.

_____

# Appendix 1

## Roster of Conspiracy Members and Other Individuals
## Involved in the Case

| Name | Aliases | Alleged Relationship to the Conspiracy | Current Status |
|---|---|---|---|
| Jose Galiany-Cruz | "Cataño" and "Jose" | Leader of the conspiracy | Appealing conviction on both counts |
| Luis Avilés-Colón | "Luggi" | Member: enforcer, drug packager, and drug seller | Appealing conviction on both counts |
| Juan Carrión Torres | "Juano" and "Juanito" | Member: enforcer | Appealing conviction on both counts |
| Julio Mateo-Espada | "Julito" | Member: runner, enforcer, and drug packager | Plead guilty to charged offenses |
| Jose Flores-Rivera | "Molle" | Member: runner and enforcer | Plead guilty to charged offenses |
| Roberto Torres-Ruiz | "Robert" | Member: enforcer, drug packager, and drug seller | Plead guilty to charged offenses |
| Kelvin Torres-Ruiz | "Kelvin" | Member: enforcer, drug packager, and drug seller | Plead guilty to charged offenses |
| Hector Reyes-Martinez | "Chanlfe" | Member: enforcer, and drug packager | Pled guilty to charged offenses |
| Rafael Ortiz-Luna | "Rafito" | Member: drug seller | Pled guilty to charged offenses |
| Carlos Ivan Torres-Martinez | "Ivan" | Member: runner and enforcer | Pled guilty to charged offenses and became cooperating witness |
| Julio Rivera-Rodriguez | | Affiliation unknown | Current status unknown |

| | | | |
|---|---|---|---|
| Carlos Bonilla Santos | | Government informant posing as a conspirator | Assisted prosecution in trial |
| Hector Reyes-Martinez | "Chalfe" | Member of conspiracy | Pled guilty to charged offenses |
| Alexander Rivera Maldonado | | Member of rival gang at Las Palmas | Murdered by Avilés, Carrión, and Flores |
| Alex Torres Franco | | Member of rival gang at Las Palmas | Murdered by Kelvin Torres-Ruiz |
| Yamil Santiago Rodriguez | | Member of rival gang at Las Palmas | Murdered by Avilés and Mateo-Espada |

# Appendix 2

## Timeline of Important Events in Charged Conspiracy

| Date | Event |
|------|-------|
| March 2001 | Bonilla testified that at some point during March he saw Galiany and Carrión together in a car. Carrión was sitting in the back seat with two AK-47s and Galiany said they were looking for "Cuquito" to kill him. |
| March 16, 2001 | Maldonado, a member of the rival Las Palmas gang, was shot. Torres testified that on that same day he drove with Galiany to pick up Carrión, Avilés, and Flores in the La Flores Ward of Coamo, the site of the shooting, and brought them to a nearby river. |
| March 17, 2001 | Torres testified that he followed Galiany's instructions to bring appellants and Flores to the river that they had visited the prior day and to then bring the same group to Galiany's home, where the appellants cleaned their weapons while others were packing drugs. |
| September 16, 2001 | Torres testified the he went with Galiany, Torres-Ruiz, and Reyez-Martinez to a Sweet 15 party at the Las Palmas housing project to avenge the murder of one of their men. While they were shooting into the crowd, they killed Franco. |
| October or November 2001 | Santiago was killed. |
| October 12, 2001 | This is the date of the undisclosed DEA report in which a confidential informant said that "a few years ago" a war started between Carrión and Galiany . |
| December 2001 | Bonilla testified that he went with Galiany to Avilés's house to collect money and saw a 30-06 Remington model rifle while there. |
| March 11, 2002 | This is the date of an undisclosed DEA report in which a confidential informant stated that approximately two weeks ago "Juano" exited his car and began shooting at Galiany's car. |
| March 21, 2002 | Bonilla testified that Galiany demanded $3,000 from him because Galiany wanted to account for Carrión's Uzi. |
| March 27, 2002 | Bonilla and Torres were discussing the fact that Carrión was working with members of a rival gang. This conversation was recorded by Bonilla. |